113 F.3d 1004
 97 Cal. Daily Op. Serv. 3460, 97 Daily Journal
D.A.R. 5965
Lawrence PERKINS; Clara Perkins; April Perkins, a minor,
by and through her Guardian ad Litem, Lawrence
Perkins, Plaintiffs-Appellants,
v.
CITY OF WEST COVINA; Detective Ferrari; Detective Melnyk,
Defendants-Appellees.
 No. 94-56365.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 7, 1996.
Submission Withdrawn April 30, 1996.
Resubmitted Sept. 30, 1996.
Decided May 9, 1997.
 
 Patrick S. Smith, Klass, Helman & Ross, Los Angeles, California, for plaintiffs-appellants.
 S. Frank Harrell, Franscell, Strickland, Roberts & Lawrence, Santa Ana, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California, Stephen V. Wilson, District Judge, Presiding. D.C. No. CV-93-07084-SVW.
 Before: CANBY, BOOCHEVER, and LEAVY, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 Lawrence, Clara, and April Perkins appeal the district court's grant of summary judgment in their 42 U.S.C. § 1983 suit against the city of West Covina, and the court's grant of qualified immunity to individual police officers. City detectives searched Perkins' home in connection with a murder investigation involving a former boarder. Perkins had difficulty securing the recovery of his property seized during the search, including cash and a starter pistol.
 
 
 2
 Perkins claims the individual officers violated his clearly established Fourth and Fourteenth Amendment rights during the search. He also claims that the city's notice of the procedure for retrieving the property, and the procedure itself, were inadequate, and therefore violated his right to due process. We affirm the district court's grant of summary judgment to the individual defendants on the ground of qualified immunity. We reverse the summary judgment in favor of the City, however, because we conclude that the City's policy violated due process by failing to notify Perkins of the means of retrieving his seized property.
 
 FACTS
 
 3
 On May 18, 1993, Julio Alberto Clark was shot to death at the home of Lashaun McDuffy in West Covina, California. When West Covina police searched McDuffy's residence, they found evidence linking McDuffy's boyfriend, Marcus Marsh (a.k.a. Marcus Winter) ("Marsh"), to the murder. They also found evidence of gang activity, a vial of rock cocaine, and $994.00 in cash.
 
 
 4
 McDuffy gave the police Marsh's telephone number, which the police traced to the home of the plaintiffs and appellants in this case, Lawrence, Clara, and April (a minor child) Perkins, at 531 Balham Avenue in La Puente, California. Another officer confirmed the address with Marsh's probation officer, and documents found in Marsh's car contained the same address. Marsh had rented a room from Perkins, although Perkins later stated that at the time of the search Marsh had moved out.
 
 
 5
 On May 20, 1993, Citrus Municipal Court Judge Dan Thomas Oki signed a search warrant authorizing a search of "all rooms, attics, basements, garages, and other parts therein" of four addresses, including Perkins' home. The warrant authorized a search for "any evidence of street gang membership or affiliation with a street gang," and "any firearms of the following caliber: 9MM. In addition ... any and all firearms for which the person in possession of said firearms cannot tender proof of ownership at the time of service."
 
 
 6
 West Covina detectives David Melnyk, Michael Ferrari, Dan Nalian, and Lieutenant John Schimanski searched the Perkins' home on May 21. No one was home, and Detective Nalian later stated that he and the other officers did not know which was Marsh's bedroom. During the search, the officers seized gang photos (some depicting Marsh), paperwork belonging to Marsh, and an address book belonging to Lawrence Perkins. They also seized a twelve-gauge shotgun and various kinds of ammunition. From the closet in a locked southwest bedroom, the officers seized a starter pistol and $2,469 in cash. Detective Ferrari testified that he reasoned it was evidence within the scope of the search warrant because the detectives had recovered narcotics and cash from McDuffy's house, and Detective Nalian stated that he considered the cash "evidence that Marcus Marsh, and perhaps other residents of the house, were involved in illegal drug and gang related criminal activity."The house was left in disarray, with damage to doors and some personal items. The officers left a form entitled "Search Warrant: Notice of Service" ("the notice"). The notice stated:
 
 To Whom it May Concern:
 
 7
 1. These premises have been searched by peace officers of the West Covina Police Department pursuant to a search warrant issued on 5-20-93, by the Honorable Dan Oki, judge of the Municipal Court, Citrus Judicial District.
 
 
 8
 2. The search was conducted on 5-21-93. A list of the property seized pursuant to the search warrant is attached.
 
 
 9
 3. If you wish further information, you may contact: Det. Ferrari or Det. Melnyk at [telephone number].
 
 
 10
 The form also listed the name "Lt. Schimanski" and his telephone number. It did not include the search warrant number.
 
 
 11
 Lawrence Perkins ("Perkins") called Detective Ferrari that day; Detective Ferrari told him to call back a few days later. Perkins called back and came in to talk to Detective Ferrari, who told him that he had no objection to releasing the money, but Perkins would need to get a court order to get the property returned. Perkins testified, and Detective Ferrari denied, that Detective Ferrari said he would help Perkins get the property back if Perkins would testify against Marsh.
 
 
 12
 Perkins attempted to obtain the court order. About a month after the search, Perkins went to Citrus Municipal Court and asked to see Judge Oki, but was told Judge Oki was on vacation. He attempted to get another judge to release the property, but Perkins was informed that there was nothing under his name, and that he needed the number of the search warrant, or a case number in Marsh's case. Although Detective Ferrari believed he gave Perkins the search warrant number, Perkins testified that it was the wrong number. Perkins also testified that he was unable to get the correct warrant number at the court because the warrant was sealed and no file number was assigned. There was no case number for Marsh because charges had not yet been filed. The search warrant, however, was listed in a public document with the court clerk by the address where the search occurred, along with the number of the search warrant. Perkins was apparently unaware of this, and no city employee informed him of the method for obtaining the number.
 
 
 13
 Perkins, Clara Perkins, and April Perkins filed suit in district court on November 19, 1993, against the city of West Covina, Detectives Ferrari and Melnyk, Lieutenant Schimanski, and Los Angeles County. The complaint alleged that the individual defendants violated the Perkins' Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 by their "arbitrary intrusion ... into the security of plaintiffs' privacy" and their search without probable cause. The complaint also alleged that the city and county maintained "an official policy and custom of permitting the occurrence of the types of wrongs set forth hereinabove and hereafter," including failing properly to train officers, encouraging arrests without probable cause, procuring unlawful search warrants, and failing to investigate police misconduct, in violation of Monell v. Department of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The complaint asked for general and special damages, pain and suffering, punitive damages, and attorney fees. The city answered, asserting qualified immunity on behalf of the individual defendants, among other affirmative defenses.
 
 
 14
 The parties filed cross-motions for summary judgment in March 1994. The district court ordered defendants to file supplemental briefs regarding the procedure for obtaining release of seized monies. At about the same time, the city filed a motion for the return of the property.
 
 
 15
 On May 12, 1994, the district court granted summary judgment for the city on the Perkins' Monell claim, and for all defendants on the claim that the warrant lacked probable cause. The court postponed a ruling on the qualified immunity of the individual officers.
 
 
 16
 The court also postponed a ruling on a claim against the city for failing to return the Perkins' seized property. Finding that "the City had a procedure for the return of unlawfully seized property; plaintiff needed only to obtain a court order. But, the City's procedure for the return of unlawfully seized property may be entirely inadequate in practice-plaintiff claims he could not obtain the court order," the district court suggested that these facts might be the basis of a due process claim not raised in the complaint, and asked for further briefing.
 
 
 17
 Trial was scheduled for June 14. The city returned the property (with the exception of the starter pistol, which had been reported stolen) on June 24, 1994, more than a year after it was seized.
 
 
 18
 On July 8, the district court granted summary judgment on all remaining claims in favor of the city and the detectives. (The county and Lieutenant Schimanski had been dismissed.) The order did not address the question whether the city's notice and procedure for recovery of seized property violated due process.
 
 
 19
 Perkins appealed. After oral argument, we remanded to the district court for determination of the due process issue. After supplemental briefing, the district court granted summary judgment for the city, holding that Perkins had waived his due process challenge to the city's procedures by failing to invoke a state statute providing for the return of improperly seized property, and that Perkins received adequate notice.
 
 DISCUSSION
 I. Qualified immunity
 
 20
 A law enforcement officer is entitled to qualified immunity in a § 1983 action if the district court determines that, in light of clearly established principles governing the conduct in question at the time of the challenged conduct, the officer could reasonably have believed that the conduct was lawful.... First, the district court must determine whether the law governing the official's conduct was clearly established at the time the challenged conduct occurred. The second step then asks whether, under that clearly established law, a reasonable officer could have believed the conduct was lawful.
 
 
 21
 Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir.1994) (as amended) (citations omitted). The plaintiff bears the burden of showing that the right allegedly violated was clearly established at the time of the alleged misconduct. Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991). "[T]he law in question must be sufficiently clear that the unlawfulness of the action would have been apparent to a reasonable official." Chew v. Gates, 27 F.3d 1432, 1447 (9th Cir.1994), cert. denied, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995). This court reviews de novo the district court's decision on qualified immunity. Elder v. Holloway, 510 U.S. 510, 515-16, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994).
 
 
 22
 Perkins claims that the officers who searched his home acted unreasonably in seizing the currency and the starter pistol because neither was mentioned in the warrant, claiming "The general rule ... is: if something is not described in the warrant, it cannot be seized." This is not an accurate statement of clearly established law at the time of the search. Instead, it was clearly established in 1993 that during a search, officers may seize an item not described in the warrant if they are in a lawful position to view the item, the item reasonably appears to be contraband, and the discovery of the item is inadvertent. United States v. Washington, 797 F.2d 1461, 1468 (9th Cir.1986) (as amended). This "plain view" doctrine applies to the seizure of an item not listed in the warrant. Arizona v. Hicks, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).
 
 
 23
 Perkins does not seriously dispute that the "plain view" rule was clearly established at the time of the search. He implies, however, that the officers were not in a "lawful position" because they were in the southwest bedroom, which Perkins asserts was his and Clara Perkins' room. Yet the officers stated that they did not know whose room was whose when they entered the house, and the warrant authorized them to search all rooms. Perkins does not suggest that the discovery of the cash and pistol was other than inadvertent.
 
 
 24
 Perkins also argues that, in light of clearly established law, the items "did not reasonably appear to be contraband." At the time of the search, it was clearly established that for a "plain view" seizure to be lawful, the officer must have probable cause to believe there is a nexus between the seized items and criminal activity. Washington, 797 F.2d at 1469. The criminal activity need not be that described in the warrant. Id. at 1468 (under search warrant related to drugs, permissible to seize items in plain view which reasonably appear to be related to prostitution).
 
 A. The cash
 
 25
 The officers found the cash in the bedroom closet where they were searching for weapons and the other items listed in the warrant. Detective Ferrari stated that because he knew that Marsh lived part time at McDuffy's residence and the search there had uncovered gang photos, cash, and drugs, and because ammunition was found at Perkins' home as well, it seemed likely that the cash was evidence of criminal activity, perhaps drug trafficking. He also noted that because Perkins' house was humble, the presence of a large amount of cash was less consistent with noncriminal behavior. Detective Melnyk testified that his experience also led him to believe the cash was evidence of illegal activity.
 
 
 26
 A large amount of cash may be evidence of intent to possess or distribute drugs. Several circuits had so held before the search in this case. See, e.g., United States v. Garcia, 983 F.2d 1160, 1165 (1st Cir.1993) ($1,308); United States v. Slater, 971 F.2d 626, 637 (10th Cir.1992) ($2,400). This circuit followed suit shortly after. United States v. Soyland, 3 F.3d 1312, 1315 (9th Cir.1993) ($4,600), cert. dismissed, --- U.S. ----, 115 S.Ct. 32, 129 L.Ed.2d 928 (1994). Perkins cites, and we have found, no authority to the contrary. We conclude that the law was clearly established that large amounts of cash may be evidence of drug activity. We now consider whether the officers acted reasonably in the light of that rule.
 
 
 27
 In each of the cases cited above drugs were also discovered. In this case the officers found no drugs in Perkins' home. Nevertheless, they had other reasons to connect the money to illegal activity: The discovery of drugs and cash at McDuffy's house, Marsh's relationship with McDuffy, Marsh's gang record, and the relatively large amount of cash relative to the Perkins family's apparent financial situation. Although--as was the case here--a large bundle of cash may turn out to be innocently earned, that does not mean that the detectives could not reasonably believe otherwise.
 
 
 28
 We hold that, in light of the law clearly established at the time of the search, the detectives could reasonably believe their seizure of a large amount of cash was lawful.
 
 B. The starter pistol
 
 29
 It was clearly established in 1993, at the time of the search of Perkins' home, that a starter pistol is not automatically a firearm or deadly weapon. In United States v. Dishman, 486 F.2d 727 (9th Cir.1973), this circuit held that carrying a starter pistol that would require retooling to convert it into an operating weapon likely to cause great bodily harm was not carrying a "deadly or dangerous weapon" per se, as described in air safety law. Id. at 732. We added, however, that "[o]f course, the situation would be different if use were made of a starter pistol on an airplane." Id. Under those circumstances, its "use" might convert it into a dangerous weapon. Id. at 731-32.
 
 
 30
 The officers in this case do not claim that this particular starter pistol was a deadly weapon. Instead, an officer present at the search (but not individually named), submitted an affidavit stating that gang members sometimes brandish starter pistols during the commission of crimes, then claim that they had no intention to harm.
 
 
 31
 Perkins cites no authority clearly establishing that a starter pistol could never be a firearm. Even considering that some starter pistols would not fall into that classification, it is reasonable to seize a starter pistol in plain view when an officer has a reason to believe that it has been or could be used in criminal or gang activity to frighten a victim. See, e.g., United States v. Dzielinski, 914 F.2d 98, 102 (7th Cir.1990) (display of starter pistol during bank robbery justified upward departure at sentencing for apparent possession of dangerous weapon).
 
 
 32
 We affirm the district court's finding of qualified immunity.
 
 II. The due process claim against the city
 
 33
 In order to succeed in the claim against the city, Perkins must show "that the [c]ity adhered to a 'policy, practice or custom' that caused [him] to be deprived of [his] constitutional rights." Pierce v. Multnomah County, 76 F.3d 1032, 1039 (9th Cir.) (citing Monell ), cert. denied, --- U.S. ----, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996).
 
 
 34
 Although Perkins alleged in the complaint that West Covina had an official policy of permitting such wrongs as the execution of searches using unlawful warrants, he neither alleged nor produced facts in support of this claim. On appeal, he claims that the city policy that violated his constitutional rights was the failure to provide a reasonable procedure for the recovery of property seized pursuant to a search warrant, or alternatively, the failure to provide him with adequate notice of the procedure for recovery of the seized property. The city does not dispute that the procedure for obtaining the release of property and the practice of leaving a form written notice at a search site constitute city policy for which it is responsible under Monell.
 
 
 35
 We review de novo the district court's grant of summary judgment on the due process claim. United States v. $874.938.00 U.S. Currency, 999 F.2d 1323, 1325 (9th Cir.1993) (per curiam).
 
 A. Procedure for return
 
 36
 The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of ... property, without due process of law." "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the status of 'property' within the meaning of the Due Process Clause." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). Those procedural constraints require that the property's owner "be given notice and an 'opportunity to be heard at a meaningful time and in a meaningful manner.' " Schneider v. County of San Diego, 28 F.3d 89, 92 (9th Cir.1994) (as amended) (quoting Brock v. Roadway Express, Inc., 481 U.S. 252, 261, 107 S.Ct. 1740, 1747, 95 L.Ed.2d 239 (1987)), cert. denied, 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1077 (1995). Although Perkins regained his property more than a year later, even "a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." Fuentes v. Shevin, 407 U.S. 67, 85, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972).
 
 
 37
 Procedural due process generally requires a hearing prior to deprivation, but a limited number of "extraordinary situations" justify postponing notice and the opportunity for a hearing until after the seizure of the property. Id. at 90-91, 92 S.Ct. at 1999-2000. Those situations involve seizures that are necessary to an important public interest; present a special need for prompt action; and utilize legitimate force which the government strictly controls. Id. at 91, 92 S.Ct. at 2000. There is thus no requirement of a prior hearing before the seizure of possessions under a search warrant:
 
 
 38
 First, a search warrant is generally issued to serve a highly important governmental need--e.g., the apprehension and conviction of criminals--rather than the mere private advantage of a private party in an economic transaction. Second, a search warrant is generally issued in situations demanding prompt action. The danger is all too obvious that a criminal will destroy or hide evidence of fruits of his crime if given any prior notice. Third, the Fourth Amendment guarantees that the State will not issue search warrants merely upon the conclusory application of a private party. It guarantees that the State will not abdicate control over the issuance of warrants and that no warrant will be issued without a prior showing of probable cause.
 
 
 39
 Id. at 93-94 n. 30, 92 S.Ct. at 2001 n. 30. In such situations,
 
 
 40
 either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking ... satisf[ies] the requirements of procedural due process.
 
 
 41
 Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981).
 
 
 42
 The city claims that the California Penal Code affords adequate post-deprivation process. Section 1536 of the Code provides:
 
 
 43
 [A]ll property or things taken on a warrant must be retained by the officer in his custody, subject to the order of the court to which he is required to return the proceedings before him, or of any other court in which the offense in respect to which the property or things taken is triable.
 
 
 44
 "Case law clearly establishes that both during and after the pendency of a criminal action, section 1536 empowers the court to entertain a summary proceeding by 'nonstatutory' motion, for the release of property seized under a search warrant." People v. Icenogle, 164 Cal.App.3d 620, 210 Cal.Rptr. 575, 577 (1985). (In this case, the motion filed by the city to obtain the release of Perkins' property was such a "nonstatutory" motion, citing § 1536.) Officers seizing property do so on behalf of the court for use in a judicial proceeding, and they must respond to court orders to release the property. Id. The officers have no right in the property or in its possession, and have no authority over it except as the court may order. Oziel v. Superior Court, 223 Cal.App.3d 1284, 273 Cal.Rptr. 196, 201-02 (1990).
 
 
 45
 Perkins argues that a "nonstatutory" motion under § 1536 was not an adequate remedy. He claims his money could not have been released, because it was never introduced into evidence in a criminal case. The court has control over seized property, however, even when as in this case, the property is never used in the underlying criminal proceeding: " '[E]ven as to property not yet offered or received in evidence ... judicial control still exists.' " Id. (quoting Gershenhorn v. Superior Court, 227 Cal.App.2d 361, 38 Cal.Rptr. 576, 579 (1964)).
 
 California Penal Code § 1540 provides:
 
 46
 PROPERTY, WHEN TO BE RESTORED FROM PERSON FROM WHOM IT WAS TAKEN. If it appears that the property taken is not the same as that described in the warrant, or that there is no probable cause for believing the existence of the grounds on which the warrant was issued, the magistrate must cause it to be restored to the person from whom it was taken.
 
 
 47
 Because one may secure a determination whether the property should be returned "immediately after the seizure ... under section[ ] ... 1540 of the Penal Code," this and other remedies such as mandamus "satisfy the requirements of due process.... The purpose of section[ ] 1540 is to provide one whose property is seized with a speedy remedy in a readily accessible court." Aday v. Superior Court, 55 Cal.2d 789, 13 Cal.Rptr. 415, 421-22, 362 P.2d 47, 53-54 (1961). A motion to return is "expressly authorized" under the statute, Gershenhorn, 38 Cal.Rptr. at 578, and "[t]he determination may be had in advance of the trial of the criminal action which ordinarily follows the seizure." People v. Bonanza Printing Co., 271 Cal.App.2d Supp. 871, 76 Cal.Rptr. 379, 381 (1969). This motion is separate from a "nonstatutory" motion under § 1536. Buker v. Superior Court, 25 Cal.App.3d 1085, 102 Cal.Rptr. 494, 497 (1972).
 
 
 48
 Perkins thus had available to him postdeprivation procedure for the return of his property--a "nonstatutory" motion under § 1536, and a § 1540 motion. We agree with the California Supreme Court that "[t]hese various remedies satisfy the requirements of due process." Aday, 13 Cal.Rptr. at 422, 362 P.2d at 54.
 
 B. Notice
 
 49
 Due process notice "must be of such nature as reasonably to convey the required information." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The "notice" left at Perkins' home simply informed him that his home had been searched by the West Covina police department, with the date of the search warrant and the issuing judge and court, the date of the search, a list of the property seized, and the names and telephone numbers of several officers of the police department to contact for "more information." The issue is whether due process required more: that the police notify Perkins of the availability of a judicial remedy should he wish to claim his property, and provide some guidance for invoking that remedy.
 
 
 50
 The Supreme Court faced a similar issue in Memphis Light. The plaintiffs, who were subject to multiple billing by the utility company, were unable to clear up the disputed charges despite visits to the company's offices, and their gas and electric service was terminated several times. The company had a procedure for the resolution of disputed bills, 436 U.S. at 6 n. 4, 98 S.Ct. at 1558 n. 4, but the notice of termination sent to the plaintiffs simply stated that payment was overdue and service would be cut off by a certain date; "No mention was made of a procedure for the disposition of a disputed claim." Id. at 13, 98 S.Ct. at 1562. The Court held that the notice was insufficient to satisfy due process:
 
 
 51
 [The] notification procedure, while adequate to apprise the [plaintiffs] of the threat of termination of service, was not "reasonably calculated" to inform them of the availability of "an opportunity to present their objections" to their bills. Mullane v. Central Hanover Trust Co., supra, at 314 [70 S.Ct. at 657]. The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending "hearing." Notice in a case of this kind does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified. As no such notice was given respondents--despite "good faith efforts" on their part--they were deprived of the notice which was their due.
 
 
 52
 Memphis Light, 436 U.S at 14-15, 98 S.Ct. at 1563 (footnotes omitted).
 
 
 53
 Here, the notice left at Perkins' home did not mention the availability of any procedure for protesting the seizure of his property, let alone the existence of a formal judicial procedure for obtaining return. It did not provide essential information necessary to invoke that procedure: the search warrant number, the method for obtaining the number from the municipal court (such as the need to furnish the court with the address searched), or the necessity for a written request for return of the property. The notice was "skeletal," like the notice that the Memphis Light court found unconstitutional. Id. at 15 n. 15, 98 S.Ct. at 1563 n. 15.
 
 
 54
 The city charges Perkins with the responsibility for his own confusion. It cites his failure to persist and to unearth the proper remedy and the method of its invocation. But Perkins, like the Memphis Light plaintiffs, made a number of telephone calls and at least two trips to the city's police station, one with his daughter, and a trip to the municipal court. While the police told him he needed a "court order," there is no evidence that they explained how to go about getting the correct warrant number, or pointed out the need for a written request. Perkins' efforts, though unavailing, were "good faith" efforts in light of the sketchy written notice and the confusing and inaccurate information he received on his calls and visits. See id. at 17 n. 19, 98 S.Ct. at 1564 n. 19 (plaintiff's trips to utility office and some explanation by employees does not undermine holding that notice was inadequate); Schneider, 28 F.3d at 93 (notice citing incorrect statute number violated due process). Nor is it any answer that the city eventually released the property. It did so on its own motion, and only long after Perkins had filed this suit. A delayed response to a lawsuit after a plaintiff has resorted to litigation under 42 U.S.C. § 1983 is not evidence that due process was afforded.
 
 
 55
 "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Seizure of property pursuant to a search warrant occurs "to thousands of [people] of various levels of education, experience, and resources" who should be clearly informed of the procedure for retrieving their property if it is not needed for the criminal proceedings. See Memphis Light, 436 U.S. at 15 n. 15, 98 S.Ct. at 1563 n. 15. People who are not suspected of criminal activity and whose property is seized are in particular need of detailed notice. As in this case, they may be uninvolved in the alleged criminal activity pursuant to which the government has seized their property without a predeprivation hearing. The "situation demands" written notice of how to retrieve the property. See Aguchak v. Montgomery Ward Co., 520 P.2d 1352, 1357 (Alaska 1974) (due process requires that written notice to legally unsophisticated and indigent defendants be more substantial, detailed, and easily understood). We find the written notice given by the West Covina Police Department was constitutionally inadequate.
 
 
 56
 The dissent concedes that "in circumstances requiring a predeprivation hearing, notice of such a hearing or process is necessary." See Parratt, 451 U.S. at 538, 101 S.Ct. at 1914 (where established procedures under state law authorize deprivation of property, due process requires predeprivation notice and hearing). Nevertheless, the dissent argues that when the state may take property without predeprivation notice or hearing, due process does not require any notice of the procedures for the return of the property. But surely when there is no opportunity for predeprivation notice or hearing, the necessity of adequate postdeprivation notice of the means of securing the return of property is at least as compelling.
 
 
 57
 The remaining issue is what notice was due in this case. To identify the specific dictates of due process, we must consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such an interest through the procedures used, and the value of additional safeguards; and (3) the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976).
 
 
 58
 The private interest in this case is in the possession and use of personal property, surely a significant interest. The risk of erroneous deprivation, especially in the emergency situations often underlying search warrants, is substantial. By contrast, the administrative and fiscal burden of providing adequate written notice is slight. The city already leaves a standard form of "notice" at the premises searched. The only burden involved is the formulation of constitutionally adequate wording by including the relevant information on the notice.
 
 
 59
 It is not our function to specify the exact phrasing of an adequate notice. In cases where property is taken under California law, however, the notice should include the following: as on the present notice, the fact of the search, its date, and the searching agency; the date of the warrant, the issuing judge, and the court in which he or she serves; and the persons to be contacted for further information. In addition, the notice must inform the recipient of the procedure for contesting the seizure or retention of the property taken, along with any additional information required for initiating that procedure in the appropriate court. In circumstances such as those presented by this record, the notice must include the search warrant number or, if it is not available or the record is sealed, the means of identifying the court file. It also must explain the need for a written motion or request to the court stating why the property should be returned.
 
 
 60
 The detailed implementation of these general requirements is left to the appropriate government agency. All that is necessary is that the notice be reasonably calculated to inform people of the means by which they may be able to secure the prompt return of their seized property.
 
 III. Perkins' right to trial
 
 61
 Perkins argues that summary judgment violates his right to trial. This issue is frivolous. Summary adjudication of a case with no material issues of fact does not deprive a party of the right to trial. See, e.g., Pease v. Rathbun-Jones Engineering Co., 243 U.S. 273, 278, 37 S.Ct. 283, 286, 61 L.Ed. 715 (1917). Summary judgment is an integral part of the federal rules, which are designed to ensure the just, speedy, and inexpensive determination of every issue. Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.Ed.2d 265 (1986) (quotations omitted). Because it determines only questions of law, summary judgment does not deprive the nonmoving party of its right to a jury trial. See Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1261 (11th Cir.1983).
 
 CONCLUSION
 
 62
 We affirm in part and reverse in part. We affirm the district court's grant of summary judgment to the individual defendants on the ground of qualified immunity. Because we find the notice given Perkins did not meet the requirements of due process, we reverse the summary judgment in favor of the city and remand to the district court for the grant of summary judgment to Perkins on this issue, and for such further proceedings as may be necessary. Each party shall bear their own costs.
 
 
 63
 LEAVY, Circuit Judge, concurring in part and dissenting in part:
 
 
 64
 I concur in all of Judge Boochever's opinion except section II.B. I dissent from that section because I do not believe that due process requires "that the police notify Perkins of the availability of a judicial remedy should he wish to claim his property, and provide some guidance for invoking that remedy." By imposing a duty on the police officers to advise Perkins on matters of state law, the opinion adds a due process requirement that has support neither in the case law nor in the Due Process Clause.
 
 
 65
 I would agree that in circumstances requiring a predeprivation hearing, notice of such a hearing or process is necessary. The Supreme Court's standard of "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action," Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), has been developed and applied in the context of predeprivation procedures. See e.g., Mullane, (publication notice of proceeding to settle trust fund accounts found to be inadequate); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (notice of dispute resolution procedures prior to terminating utility service held to be inadequate); Greene v. Lindsey, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (posted notice of eviction found to be constitutionally inadequate); Schneider v. County of San Diego, 28 F.3d 89 (9th Cir.1994), cert. denied, 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1077 (1995) (due process violation where seizure notice did not state that abandoned vehicles would be destroyed). These requirements are inapplicable where, as here, Perkins' property was rightfully seized pursuant to a search warrant without need for a predeprivation proceeding.
 
 
 66
 Because Perkins' property was lawfully seized, due process requires "the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). The majority concede that the postdeprivation procedures provided under California law "satisfy the requirements of due process ... and conform with the requirements laid down by the Supreme Court of the United States." Perkins' property was rightfully seized and held by the police, and California law provides a means for him to obtain return of his property. I cannot agree that due process requires the City of West Covina to advise Perkins of his remedies.
 
 
 67
 As the majority points out, Perkins brought this action in November 1993. In June 1994, Perkins' property was returned upon motion of the city. Surely the majority does not intend to allow recovery for deprivation of Perkins' property while he and his lawyer failed to seek its return. The Due Process Clause does not require the City of West Covina to provide legal advice to Perkins or any other person with a claim against the city.